**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **ALEXANDER E. JONES,** | § | Case No. 22-33553 (CML) |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| **Alexander E. Jones, as Debtor and as Owner and Sole Manager of Free Speech Systems, LLC,** | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. P. No. 24-03238 (CML) |
| | § | |
| **Christopher Murray, as the Chapter 7 Trustee and Global Tetrahedron, LLC, Mark Barden, Jacqueline Barden, Francine Wheeler, David Wheeler, Ian Hockley, Nicole Hockley, Jennifer Hensel, William Aldenberg, William Sherlach, Carlos M. Soto,  Donna Soto, Jillian Soto-Marino, Carlee Soto Parisi, Robert Parker, and Erica Ash,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**TRUSTEE'S OBJECTION TO THE DEBTOR'S**
**EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER**
**[Relates to Adv. Docket No. 1]**

Christopher R. Murray, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of

Alexander E. Jones ("Jones" or the "Debtor"), files this Objection (the "Objection") to the

*Plaintiffs' Complaint and Emergency Application for Temporary Restraining Order and*

1

*Preliminary Injunction Pursuant to Bankruptcy Rule 7065* (the "Emergency Application" or

"TRO"),[1] and would respectfully show as follows:

## PRELIMINARY STATEMENT OF ISSUES

1.      The Debtor has for some time been collaborating with his friend and business

associate, Charles Cicack, to acquire the assets of Free Speech Systems, LLC ("FSS") through an

entity known as First United American Companies, LLC ("FUAC").  The Debtor's plan was to

work with FUAC to continue broadcasting his show under the "Infowars" brand using FSS assets

acquired from the estate.

2.      To that end, FUAC participated in the auction of FSS assets through the final round

of bidding, without complaint or incident. Like all bidders, FUAC was aware that the Court

authorized the Trustee to conduct a sealed bid auction process.  Neither FUAC nor the Debtor *ever*

complained or objected to a sealed bid auction process—that is not until FUAC was not selected

as the winning bidder.

3.      As set forth in the *Trustee's Expedited Motion for Entry of an Order in Furtherance*

*of the Sale of Assets of Free Speech Systems, LLC* [Main Case Docket No. 915] (the "Sale

Motion"), FUAC did not submit the *highest and best bid* to purchase FSS assets.  FUAC was,

---

[1] This Objection is filed solely in response to the Debtor's *emergency* request for a Temporary Restraining Order ("TRO"), included as part of the Complaint filed in this Adversary Proceeding [Docket No. 1].  The Trustee expressly reserves the right to submit further briefing and make additional arguments in connection with the Debtor's request for TRO and/or any request for a preliminary or permanent injunction. There is currently no deadline to file a pleading responsive to the Complaint. The Trustee reserves all rights to respond to the Debtor's allegations in the Complaint in any responsive pleadings or pleadings asserting counter or cross claims against any party. The Trustee reserves all rights and remedies, including but not limited to those governed by FED. R. CIV. P. 11 and 11 U.S.C. §362 with respect to the filing of the Complaint and the falsity of statements made in the Complaint as well as the Declaration of Alex Jones, attached thereto.

however, designated as the Back-Up Bidder[2] and the Trustee is prepared to close with FUAC should the Successful Bidder fail to close.

4.     Given the wide variety of assets sold in bankruptcy auctions, there is also a wide variety of bankruptcy auction procedures and formats employed in bankruptcy cases.  It is not uncommon for parties to disagree with the outcome of bankruptcy auctions.  There is a rational process to address any such disagreements—through the Court's consideration of the Sale Motion.

5.     This Adversary Proceeding and the *emergency* TRO requested by the Debtor are part of a desperate attempt to delay a hearing on the Sale Motion and in furtherance of a vicious smear campaign lobbing patently false accusations against the Trustee and his professionals, the Successful Bidder, and the Office of the United States Trustee.  The Court should deny the Debtor's request for an *emergency* TRO because the Debtor does not come within hailing distance of demonstrating he is entitled to such a drastic and extraordinary remedy.

6.     ***First***, there is <u>no risk</u> of irreparable injury to the Debtor to allow the Trustee to manage, control, and/or administer estate property in accordance with the Bankruptcy Code, this Court's orders, and under the supervision of this Court.  By comparison, the estate is at substantial risk of irreparable injury if the Court enters a TRO that authorizes the Debtor to manage and control estate property to the exclusion of the Trustee and outside the supervision of this Court.  Granting the Debtor's request to exclusively control estate property would only serve to retroactively bless what the Debtor has already done (in violation and contempt of this Court's orders) to block the Trustee's access to estate property, to potentially create new liability for the estate without the Trustee's consent, and to interfere with the Trustee's duly authorized operation of FSS.  The

---

[2] Unless otherwise specifically defined, capitalized terms in this Preliminary Statement carry the meanings ascribed to them in the remainder of the Objection or as set forth in the Sale Motion.

Debtor attempts to manufacture irreparable injury through *false* accusations, which are addressed in more detail herein. False accusations and invented facts are insufficient to demonstrate a likelihood of success on the merits for purposing of entering the requested TRO. The Court should not grant the extraordinary and drastic remedy of a TRO based upon imaginary anxieties. The Debtor relies on unfounded and false facts in his Expedited Application to try to manufacture "injury" needed to obtain a temporary restraining order. For example,

    a. <u>No Employees of FSS Were Fired by the Trustee</u>. The Debtor alleged in the Expedited Application that the Trustee fired FSS employees when the Successful Bidder was announced. Emergency Application ¶ 15(a). This allegation is false. Not only did the Trustee *not* fire any FSS employees, he personally went to the FSS studio on November 14, 2024, to reassure employees regarding their continued employment and compensation *at least* through the end of the year but certainly pending the Court's approval of the sale to the Successful Bidder. The Trustee attempted to meet with employees to personally reassure them that there would be no immediate change to their employment status or compensation. The Debtor refused to meet with the Trustee in-person. Through the Debtor's professionals, the Trustee implored the Debtor to meet with the employees together to ensure they received a consistent message about their employment status and compensation. The Debtor refused.

    b. <u>The Trustee Has Not Already Assigned Assets</u>. The Debtor falsely alleges that the Trustee has already assigned FSS assets to Global Tetrahedron, Inc. This allegation is false. The Trustee has not assigned any FSS assets to anyone.

    c. <u>The Trustee Has Not Permitted Use of FSS Assets</u>. The Debtor falsely alleges that the Trustee "permitted the [sic] Tetrahedron to in some manner re-design or re-direct the InfoWars website to its own, touting that Tetrahedron was the new owner of InfoWars." Emergency Application ¶ 15(c). This allegation is also false. The Trustee has not authorized or consented to the Successful Bidder's use of FSS assets in any form or fashion before receiving Court approval of the sale and closing the transaction.

    d. <u>The Trustee Has Not Transferred Any Websites Owned by FSS</u>. The Debtor falsely alleges that "control of the [InfoWars] website was transferred to Tetrahedron." Emergency Application ¶ 41. Not only is this a false allegation, it is also a knowingly false allegation. Any attempt to access the Infowars website would have generated an entry in a computer log that would show any such transfer. No such entry exists. Moreover, any attempt to access the Infowars website would have generated a 2-factor authentication code that is controlled by an FSS employee. The Trustee would have had to request the 2-factor authentication code from the FSS employee and that simply *never* happened.

15675328

e. <u>The Trustee Did Not Shut Down FSS Online Store</u>. The Debtor alleges that the Trustee "shutdown the revenue stream of FSS's inventory of perishable consumer products." Emergency Application ¶ 15(d). This is a misleading statement. The Trustee asked only to temporarily suspend new customer orders for 24-hours to ensure that FSS would have the ability to fulfill new orders in the interval between announcing the Successful Bidder and actually closing a sale. The Trustee wanted to ensure that customers would be treated fairly and did not want to take customer money if FSS was not going to be able to fulfill new orders. Likewise, the Trustee wanted to avoid credit card chargebacks that would follow if FSS accepted orders and then was unable to fulfill those orders. New credit card chargebacks slow the release of substantial reserves held by FSS's merchant bank. Customers were always able to view products and join a waitlist to be notified when FSS was able to start filling new orders, which was only 24-hours after the Trustee temporarily suspended sales from the on-line FSS retail store.

f. <u>The Trustee Has Not Taken or "Secreted" Assets</u>. The Debtor demands the Trustee "Identify to Alex Jones all assets (tangible or intangible) to FSS and/or Alex Jones known to have been taken and/or secreted." Emergency Application ¶ 56(d). There are no such assets. This demand is unfounded and inflammatory. The Court should not grant TRO relief based upon fanciful and fictitious facts.

g. <u>The Trustee Has Not Taken or Removed the Debtor's Assets.</u> The Debtor demands that the Trustee "Return to the business offices of FSS and to control of Alex Jones, who is the duly elected Manager of FSS, all assets of FSS and/or Alex Jones that have been taken." Emergency Application ¶ 56(c). No assets were "taken" by the Trustee, his professionals, or the Successful Bidder. The Trustee directed the imaging of FSS hard drives and servers, which is a routine data-preservation activity in a chapter 7 bankruptcy case. However, the Debtor has interfered in the collection of that data, has blocked the Trustee's IT professionals from access to much of the data, and has refused to turnover passwords and login credentials needed to access that data. The Debtor has no right to manage or exercise control of FSS in light of the Supplemental Dismissal Order (unopposed by the Debtor), which provides that "[t]he Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court." Supplemental Dismissal Order ¶ 2. The Court should not grant a TRO based on specious claims of the Debtor that are simply not based in reality. The Debtor is not "irreparably injured," for purposes of a TRO, by the Trustee following this Court's orders.

h. <u>The Trustee Did Not Take Alex Jones Off the Air</u>. The Debtor alleges he is entitled to a TRO because the Trustee "took the Alex Jones Show and InfoWars off the air." Emergency Application ¶ 15(a). This is only partially accurate and highly misleading. Prior to the Auction, the Debtor told the Trustee (through his professionals) and the world (through his broadcasts) that he had a backup studio ready to go in the event that he lost access to the Infowars platform. On November 14, 2024, the Trustee attempted to meet with the Debtor to facilitate an orderly transition of his broadcast off the InfoWars platform in light of the anticipated sale.

15675328

The Trustee instructed the Debtor, through his professionals, to cease use of FSS assets and *temporarily* disconnected the www.infowars.com and banned.video domain names. But the Debtor did not stop broadcasting. At first, the Debtor refused to leave the FSS facilities. At some point during the day, he appeared to broadcast his show from an alternate location. Thereafter, he appeared to move back into FSS's facilities.

7.      ***Second***, there is no risk of irreparable injury to the Debtor because any sale of FSS assets will be the subject of an order of this Court in connection with the Sale Motion. The Trustee has and will continue to follow this Court's orders. The *emergency* TRO requested by the Debtor in this Adversary Proceeding actually seeks to block the Court from exercising its authority and jurisdiction with respect to the Sale Motion. Entering the TRO requested by the Debtor will derail the ongoing sale process and would strip this Court of its authority to conduct hearings under 11 U.S.C. § 363. All issues related to the sale process should be addressed by the Court in the context of the Sale Motion and the Trustee looks forward to a full evidentiary hearing on the merits of the proposed sale in the main bankruptcy case. The Court's disposition of the Sale Motion will moot the causes of action asserted by the Debtor in this Adversary Proceeding. The Debtor's *emergency* request for a TRO is unnecessary and is a distraction.

8.      ***Third***, there is no risk of irreparable injury to the Debtor with respect to the sale of contested IP because the Trustee is not attempting to sell any contested IP in the proposed sale of FSS assets.

a.   The Debtor's individual or personal intellectual property rights were expressly ***excluded*** from the sale of FSS by agreement with the Debtor. *Order Granting Trustee's Motion for Entry of an Order Authorizing the Winddown of Free Speech Systems, LLC* ¶ 31 [Main Case Docket No. 859] (the "Winddown Order"). The Debtor did not oppose the Trustee's sale of FSS assets pursuant to the Winddown Order.

b.   It is clear from the detailed list of FSS assets included with the pending Sale Motion[3], that the Trustee is ***not selling*** any of the Debtor's individual or personal intellectual

---

[3] *Trustee's Expedited Motion for Entry of an Order in Furtherance of the Sale of Assets of Free Speech Systems, LLC* ("Sale Motion")[Dkt. 915].

6

property rights, including but not limited to any social media accounts of the Debtor or his personal name, image and likeness.

c.  While the Trustee disagrees with the Debtor's newly proclaimed and previously undisclosed "liberty rights" in certain web domains owned by FSS, the Trustee agreed to remove those domains from this sale of FSS assets and the Successful Bidder consented.  The Back-Up Bidder has not advised the Trustee whether it consents to remove those domains from the sale or if it has secured the agreement and cooperation of the Debtor to acquire or waive his so-called "liberty interests" in the those FSS web domains.

d.  Recently, X (formerly Twitter) appeared at a status conference regarding the naming of the Successful Bidder asserting that it would not give consent to the transfer of FSS's X account ("@infowars") in connection with a sale of FSS's assets.  While the Trustee is evaluating X's position, he has nevertheless reached out to both the Successful Bidder and the Back-up Bidder to advise them of  the issues raised by X.

9.      ***Fourth***, there is <u>no risk</u> of irreparable injury to the Debtor with respect to the continued operation of FSS by the Trustee. It would be inappropriate to enter the *emergency* TRO requested by the Debtor with respect to FSS operations, over which the Debtor seeks exclusive control.  Having voluntarily filed for bankruptcy protection and consenting to conversion to a chapter 7 case, the Debtor no longer owns FSS nor does he have authority to exercise control over FSS's assets. 11 U.S.C. §§ 362, 541.  Entering a TRO to allow the Debtor to exclusively control and manage estate property in his chapter 7 case disregards the most fundamental precepts of the Bankruptcy Code and therefore does not promote public interest.  To be clear, the Court put FSS and its assets under the control of the Trustee and authorized the Trustee to operate the FSS business, pending a sale of its assets. Dismissal Order [Case No. 22-60043 Docket No. 956] and Supplemental Dismissal Order [Case No. 22-60043 Docket No. 1021].  The Debtor did not object to and/or appeal the Dismissal Order or the Supplemental Dismissal Order.  The Debtor should not be allowed use a TRO to collaterally attack the Court's previous orders, to act in contempt of those orders, or to dictate the business decisions of the Trustee with respect to the management of estate assets.

15675328

10.     **Fifth**, the Debtor cannot demonstrate a likelihood of success on the merits for claims, which on their face, will be dismissed under FED. R. CIV. P. 12(b) due to the Debtor's lack of capacity, authority, or standing to pursue. The Debtor neither owns FSS nor has authority to exercise control over FSS. The Trustee did not consent to the Debtor filing pleadings on behalf of FSS. The Debtor is prohibited, as a matter of law, from seeking a TRO or initiating legal proceedings on behalf of FSS.

11.     **Sixth**, the Debtor failed to meet even basic pleading requirements under FED. R. CIV. P. 65 (and the local rules) by failing to attach a proposed order to his pleading self-styled as "*Plaintiffs' Complaint and Emergency Application for Temporary Restraining Order and Preliminary Injunction Pursuant To Bankruptcy Rule 7065*" [Docket No. 1].  The parties and the Court are not required to hunt through a 38-page pleading (which itself fails to comply with pleading requirements under FED. R. CIV. P. 8 and 9) to try to interpret precisely what injunctive relief the Debtor might be seeking on an *emergency* basis.  The Debtor's failure to comply with basic pleading requirements to obtain a TRO deprives the Trustee (and the other parties the Debtor seeks to enjoin) of the notice the rules intended to guarantee by imposing those basic pleading standards on parties seeking a drastic remedy.  Given the extraordinary relief requested by the Debtor, the equities balance in favor of the Trustee and against granting relief requested by the Debtor in his grossly deficient pleadings.

12.     **Seventh**, the Debtor has neither offered nor demonstrated that he is able to post a bond sufficient to pay damages caused by wrongfully enjoining the Trustee and other parties. For this reason, the equities tip in favor of the Trustee and the Debtor's request for an *emergency* TRO should be denied.

13.     For all these reasons and as set forth in additional detail below, the Court should deny the Debtor's *emergency* request for a TRO.

## BACKGROUND

14.     The Debtor's allegations in the Expedited Application are nothing more than conclusory statements based on either knowingly false, or exaggerated, facts. The Trustee addresses the relevant facts herein. To summarize, the Debtor asserts that an *emergency* TRO is warranted based on the following categories of alleged "irreparable injury":

    a.  <u>First</u>, the Debtor falsely accuses the Trustee of colluding with the Successful Bidder to rig the auction process and challenges the format of the auction. The Trustee unequivocally denies collusion with any bidder and reserves all rights with respect to the assertion of collusion without any reasonable basis. The Trustee will demonstrate at the hearing on the Sale Motion that he exercised reasonable business judgment and acted in good faith in all aspects of the auction process authorized by the Court in the Winddown Order.

    b.  <u>Second</u>, the Debtor seeks *emergency* injunctive relief to prevent a sale of contested IP assets that are absolutely not included in the proposed sale to the Successful Bidder.

    c.  <u>Third</u>, the Debtor seeks *emergency* injunctive relief to enjoin the Trustee from managing estate property and to grant the Debtor exclusive control to manage and control estate property, including operating FSS. The Debtor cites to several very specific but completely fabricated reasons to support this request. The Court has duly authorized the Trustee to operate FSS and the Debtor never once objected. Moreover, the Bankruptcy Code and other applicable law vests authority to operate FSS in the Trustee.

## I.     Alleged Collusion and Rigged/Secret Bid Process

15.     On September 25, 2024, the Court entered the Winddown Order, authorizing the Trustee to market and sell the therein-defined FSS Assets.  The sales process is more fully described in the Sale Motion, which is incorporated here. *See* Sale Motion ¶¶ 15–44.  At all times, the Trustee acted in a manner consistent with his business judgment and his goal of consummating a transaction that was in the best interests of the estate.  The Trustee in no way slanted the process in favor of any potential purchaser, and he selected the Successful Bid based on its economics.

**II.      Contested IP Assets Are Not Included in the Proposed Sale**

16.      In the Winddown Order, entered on September 25, 2024, the Court approved the sale of all intellectual property assets of FSS, which included without limitation, FSS's social media accounts, domain names, registered and unregistered trademarks, and production rights. Expressly excluded from the sale was any individual or personal intellectual property owned personally by Jones or his chapter 7 estate.  The Winddown Order also authorized the sale of FSS's remaining assets, which included FSS's personal and tangible property, including but not limited to, broadcasting studio equipment, cameras, video production equipment, and vehicles owned by FSS.

17.      On October 15, 2024, the Trustee filed the *Emergency Motion for Entry of an Order Authorizing (I) the Sale of Intellectual Property Assets in Connection with the Winddown of Free Speech Systems, LLC and (II) the Assumption and Assignment of Executory Contracts* [Main Case Docket No. 882] (the "Jones IP Assets Sale Motion").  At the request of potential bidders, including FUAC, the Trustee filed the Jones IP Assets Sale Motion to seek permission to include a limited group of intellectual property assets Jones claimed as personal and individual assets, but which the Trustee believes are property of his chapter 7 estate.

18.      The Jones IP Asset Sale Motion *only* sought to include the following assets: (1) Jones's social media accounts (*i.e.* the X account styled as "@realalexjones"); (2) rights under a book publishing agreement; and (3) the rights to royalties under a videogame development agreement (collectively, the "Jones IP Assets").  After an initial hearing on the Jones IP Asset Sale Motion, it became clear that seeking to add the Jones IP Assets in the already approved and noticed auction of FSS assets was going to cause unnecessary delay.  The potential bidders, including FUAC, indicated that they would be willing to participate in the auction of FSS assets, as originally planned, without the Jones IP Assets.

15675328

19.      Despite the Debtor and FUAC's attempt to mislead the Court into believing that the Trustee sold the Jones IP Assets, it is simply not true. The Trustee has ***not*** attempted to sell the Jones IP Assets and ***will not*** do so until he receives authorization from the Court.

20.      In his Emergency Application, the Debtor contends that he has intellectual property rights to, amongst other things, "internet domain names containing in whole or in part, the name Jones, 'Alex Jones,' 'Alex E. Jones,'…" Emergency Application at 2, fn. 2 (the "Disputed Domain Names"). The Disputed Domain Names are scheduled as FSS assets (at a time when the Debtor was actually managing FSS) along with numerous other domain names that no one disputes are owned by FSS [Case No. 22-60043 Docket No. 900 at 18-33]. The FSS schedules do not differentiate between the Disputed Domain Names and the rest of the domain names owned by FSS – they are all listed as domain names owned by FSS. Conversely, the Disputed Domain Names were not scheduled by the Debtor in his personal bankruptcy schedules. [Main Case Docket No. 749 at 54]. Jones, having signed his schedules, certified under penalty of perjury that the summary and schedules filed with his declaration were true and correct. [Main Case Docket No. 749 at 54].

21.      After entry of the Winddown Order, the Trustee, with the assistance of Tranzon360 and counsel, analyzed the FSS IP Assets—alongside FSS employees and independent contractors, for the purposes of preparing the sealed bid package and data room for potential bidders. In October, the Trustee discovered that the Disputed Domain Names and some other domain names owned by FSS were taken or removed from the FSS domain registry. In light of the unauthorized taking of the Disputed Domain Names and other domain names owned by the Debtor, the data room was updated with a list of what the Trustee referred to as "Contested Domains" and bidders were notified that these domains were missing in action.

15675328

22.     Both Qualified Bidders submitted bids for assets that included the Disputed Domain Names.  Without waiving the estate's rights to the Disputed Domain Names, the Disputed Domain Names were ultimately excluded from the sale to the Successful Bidder and are described in the proposed APA (attached as Exhibit A to the Trustee's Sale Motion) under "Excluded Assets" and listed specifically on Schedule 1.1(b)(xi) to the APA [Main Case Docket No. 915-1 at 75].

## ARGUMENT AND AUTHORITIES

### I.     Legal Standard

23.     Because a preliminary injunction is "an extraordinary and drastic remedy," the Supreme Court has emphasized that "[i]t should never be awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A court may grant the extraordinary relief of a temporary restraining order or preliminary injunction only if the movant establishes all four components of the stringent standard for injunctive relief: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer immediate and irreparable harm if the temporary restraining order or injunction does not issue; (3) that the threatened harm to the movant outweighs any injury or damage the temporary restraining order or preliminary injunction may cause to the defendant; and (4) that the granting of the temporary restraining order or preliminary injunction will not disserve the public interest.  *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011).  The movant "must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  This is an exacting standard that cannot be satisfied with unsupported or conclusory allegations or affidavits.  *See, e.g.*, *Higgins v. Lumpkin*, 2022 WL 1517039, at *1 (5th Cir. May 13, 2022) (per curiam); *Mora v. Koy*, 2012 WL 12894812, at *1 (S.D. Tex. Nov. 30, 2012) ("Injunctive relief . . . requires an unequivocal showing

12

of the need for the relief to issue [and] should only be granted where the movant has 'clearly carried the burden of persuasion.'" (citation and quotation omitted)).

24.     Contrary to the Emergency Application's suggestions (¶¶ 57–60), courts in this Circuit have repeatedly rejected the idea that section 105 dispenses with the typical requirements for injunctive relief common to all federal cases.  *See In re Cont'l Air Lines, Inc.*, 61 B.R. 758, 781–82 (S.D. Tex. 1986) ("Injunctive relief granted pursuant to section 105 must be tested against the standards of Rule 65, Federal Rules of Civil Procedure, which is expressly made applicable to bankrupt[c]y proceedings."); *see also In re Heritage Real Estate Inv., Inc.*, 2021 WL 1395592, at *13 (Bankr. S.D. Miss. Feb. 4, 2021); *In re Gomez*, 520 B.R. 233, 236–37 (Bankr. S.D. Tex. 2014); *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 181 (Bankr. N.D. Tex. 2012); *In re Tribeca Lofts LP*, 2011 WL 3878369, at *2 (Bankr. S.D. Tex. Aug. 30, 2011) (Isgur, J.); *In re Yukos Oil Co.*, 320 B.R. 130, 135 (Bankr. S.D. Tex. 2004).

## II.     The Debtor Has Not Carried His Burden on the Emergency Application

### A.     The Debtor Falls Well Short of Demonstrating a Substantial Likelihood of Success on the Merits

25.     As a prerequisite to receiving injunctive relief, the Debtor must establish a substantial likelihood that they will prevail on their merits of their claims.  While it is not entirely clear, it appears that the Debtor brings two claims: one for alleged violations of unspecified orders of this Court that are somehow "contractual in nature," and another for declarations relating to those alleged violations.  The Debtor has not met his burden with respect to the first element of injunctive relief because: (1) they lack standing to bring the claims upon which the requests for injunctive relief are predicated; (2) there has been no violation of the Winddown Order; (3) the Debtor relies on conclusory and unsubstantiated allegations; and (4) the Debtor's claims otherwise fail on their merits.

1.      **The Debtor Lacks Standing with Respect to Their Claims**

   a.      **The Debtor Does Not Have Standing to Challenge the Sale of Estate Property**

26.      Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Fifth Circuit instructs courts to read section 541 "broadly . . . to 'include all kinds of property, including tangible or intangible property [and] causes of action." *In re Equinox Oil Co., Inc.*, 300 F.3d 614, 618 (5th Cir. 2002) (quotation omitted); *see also In re S. Coast Supply Co.*, 91 F.4th 376, 381–82 (5th Cir. 2024) (noting that Congress intended a broad range of property to be included in the estate and that "[t]he conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the bankruptcy estate," nor does the fact that rights were created by the Bankruptcy Code (quotation omitted)). This is because "[s]weeping all of the debtor's property into the bankruptcy estate created at filing is the means by which the Code achieves effective and equitable bankruptcy administration." *In re OGA Charters, L.L.C.*, 901 F.3d 599, 605 (5th Cir. 2018) (quotation omitted). Thus, "[s]ection 541 . . . provides that virtually all of a debtor's assets, including causes of action belonging to the debtor at the commencement of the bankruptcy case, vest in the bankruptcy estate upon the filing of a bankruptcy petition." *Kane v. National Union Fire Insurance Co.*, 535 F.3d 380, 385 (5th Cir. 2008).

27.      Only a person "whose pecuniary interests are directly affected by the bankruptcy proceedings" is a "party in interest" such that it has standing in bankruptcy proceedings.[4] *See In re Cyrus II P'ship*, 358 B.R. 311, 315 (Bankr. S.D. Tex. 2007) (Isgur, J.). "Once an asset becomes

---

[4] "[W]here a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quotation omitted).

part of the bankruptcy estate, all rights held by the debtor in the asset are extinguished" and the appointed bankruptcy trustee becomes "the representative of the bankruptcy estate." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (per curiam). This means that "once a trustee is in a bankruptcy case, the trustee, not the debtor or the debtor's principal, has the capacity to represent the estate and to sue and be sued." *In re Mandel*, 641 F. App'x 400, 402–03 (5th Cir. 2016) (unpublished) (quotation omitted).

28.     In fact, chapter 7 debtors rarely possess a sufficient pecuniary interest in bankruptcy proceedings to give rise to standing to even object. *See, e.g.*, *In re Baroni*, 643 B.R. 253, 285–86 (Bankr. C.D. Cal. 2022) (collecting examples of objections for which debtors lack standing); *see also In re Cyrus II P'ship*, 358 B.R. at 315 ("Generally, chapter 7 debtors are not considered persons with a pecuniary interest in the estate."). The instant case falls well within the "general rule" that "the debtor in a liquidation proceeding is hopelessly insolvent, and thus has no pecuniary interest in the administration of the estate." *In re Solomon*, 129 F.3d 608, at *6 n.10 (5th Cir. 1997) (unpublished).[5] This rule reflects the reality that "no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." *Novoa v. Esparza*, 2014 WL 10186158, at *2 (W.D. Tex. Oct. 15, 2014) (quotation omitted).

29.     Although not a model of clarity, it appears Jones seeks a declaration that is the functional equivalent of an objection to the Sale, which he contends involves the transfer of "persona" and "IP" constituting exempt property. Yet, although the Debtor acknowledges the existence of in-district precedent precluding their standing, they nevertheless go on to cite

---

[5] There are limited exceptions to the general rule, such as where there is a non-speculative potential the debtor will receive a distribution or questions of dischargeability or exempt property, but none are implicated here. *See generally Matter of Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018) (finding no standing where the "speculative prospect of harm is far from a direct, adverse, pecuniary hit").

inapposite caselaw—none of which actually addresses a debtor's (rather than a court's) ability to challenge a sale—and conflate his standing with this Court's jurisdiction. *See, e.g.*, Emergency Application ¶¶ 57–60. This makes sense since courts across the nation have routinely held that the general rule regarding standing applies to preclude a debtor's objection to a sale. *See, e.g.*, *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2d Cir. 2000); *In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 89–90 (Bankr. W.D. Tex. 2000); *In re Hutter*, 215 B.R. 308, 312 (Bankr. D. Conn. 1997). Perhaps recognizing this issue, the Emergency Application points to the appeal of the state court suits and further suggests that the sale involves exempt property. Neither contention is availing.

30. As it stands, Jones's estate is "hopelessly insolvent." The Trustee (the only party with the right to do so) has chosen not to pursue the appeal of the state court suits on behalf of FSS, but even if he did choose to pursue those appeals, the judgments would have to be overturned to create a potential of a surplus.[6] The Fifth Circuit is clear that there is no standing where "speculative prospect of harm is far from a direct, adverse, pecuniary hit." *In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018). Jones may not like the state court judgments, but that does not mean he can ignore them to create standing here.

31. Jones's contention regarding exempt property is similarly flawed. As explained above, section 541 clearly sweeps assets like his (or FSS's) "persona" and "IP" into the estate. *See, e.g.*, *In re CTLI, LLC*, 528 B.R. 359, 366 (Bankr. S.D. Tex. 2015) (Bohm, J.) (finding social media accounts were property of the estate); *In re Vital Pharm.*, 652 B.R. 392, 413 (Bankr. S.D.

---

[6] The Trustee is not prosecuting appeals of those judgments on behalf of FSS, and such appellate rights are property of FSS, which are vested in the bankruptcy estate of the Debtor as property of his estate to be administered by the Trustee pursuant to the Supplemental Dismissal Order. The Fifth Circuit has found that defensive appellate rights are property under state law, become property of the debtor's estate, and may be sold by the trustee. *See Croft v. Lowry (In re Croft),* 737 F.3d 372, 377 (5th Cir. 2013).

Fla. 2023) (same).  Even a cursory review of Jones's schedules (and those of FSS) reveals a failure to assert any such exemption.  *See Schedules A/B, C, D, E/F, G, H, I, J, and Summary of Assets and Liabilities* [Main Case Docket No. 750]; *see also In re Money Centers of Am.*, 2020 WL 6709971, at *9–10 (D. Del. Nov. 16, 2020) (declining discharge under section 727 based on the debtor's failure to schedule a domain name).  More fundamentally, the Emergency Application overlooks that the Trustee is ***not*** seeking to sell the "Jones Persona" or the "Jones IP."  *Compare* Emergency Application at 2 n.1*, with* APA §§ 1.1 & Scheds. 1.1(a)(i)–(iii), 1.1(b)(xi).

      **b.**    **In an Ironic Twist, Jones Violated the Automatic Stay and Collaterally Attacked the Supplemental Dismissal Order by Purporting to Assert FSS's Rights**

32.      As a direct result of actions precisely like the Emergency Application, the Court entered the *Order Supplementing Order Dismissing Case* [Case No. 22-60043, Docket No. 1021] (the "<u>Supplemental Dismissal Order</u>") to eliminate all doubt regarding the impact of its dismissal of the separate FSS proceedings:

    1.    Effective as of the entry of the Order Dismissing Case [Docket No. 956] (the "Dismissal Order"), pursuant to Section 349(b), all property of the estate of Debtor Free Speech Systems, LLC ("FSS") shall be deemed to have vested in the bankruptcy estate of Alexander E. Jones, Case No. 22-33553, as property of that estate pursuant to Section 541 and shall be under the control of the trustee of such estate ("Chapter 7 Trustee").

    2.    The Chapter 7 Trustee is authorized to operate the business of FSS pursuant to Section 721 for a period not to exceed one year, absent further order of this Court.

*See* Supplemental Dismissal Order; *see also* Order Dismissing Case [Case No. 22-60043, Docket No. 956].  Notwithstanding this painfully clear language, Jones brought the Emergency Application on behalf of FSS as its Manager and owner.  However, neither Jones nor FSS objected to, sought reconsideration of, or appealed the Supplemental Dismissal Order.

15675328

33.     Because the Supplemental Dismissal Order is a final judgment it is not subject to collateral attack.  *See In re Flores*, 271 B.R. 213, at *3 (B.A.P. 10th Cir. 2001) (unpublished); *In re Dicks*, 579 B.R. 704, 707 (Bankr. E.D.N.Y. 2017); *In re Antelope Techs., Inc.*, 2010 WL 2901017, at *3 (S.D. Tex. July 21, 2010); *Caffey v. Heller First Capital Corp.*, 2007 WL 9710411, at *7 (W.D. Tex. June 12, 2007).  The Fifth Circuit has held that even where an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.  *Miller v. Meinhard– Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972); *accord In re Christ Hosp.*, 502 B.R. 158, 185 (Bankr. D.N.J. 2013) (finding suit a collateral attack that, although not expressly seeking to set it, constituted a frontal attack on a prior order).  Ultimately, "[a] collateral attack includes any request for relief that is inconsistent with a prior judgment."  *Elttes, LLC v. NTNS Accounting & Tax Servs., Inc.*, 2023 WL 3260733, at *5 (W.D. Tex. May 4, 2023).  But that is precisely what Jones seeks to do by the Emergency Application.  Not only does the Emergency Application seek to deprive the Trustee of the rights previously granted to him, but the Emergency Application itself constitutes a use of rights subject to the Trustee's sole control pursuant to the Supplemental Dismissal Order.

## 2.     The Debtor Cannot Show that the Trustee Exceeded His Authority

34.     In addition to complaining about the subject of the Sale, the Debtor seeks to supplant the Trustee's business judgment with their own preferences.  Specifically, the Debtor challenges both the manner in which the Trustee conducted the Auction and Sale and the Trustee's determination of the highest or otherwise best bid.  Even assuming the Debtor had standing to raise these issues, these attacks on the Trustee's valid exercise of his business judgment are unsupported and, more importantly, ***they are subject to the Court's approval in connection with consideration of the Sale Motion***.

18

### a.      The Trustee Properly Conducted the Auction and the Proposed Sale

35.      The essence of the Debtor's procedural objection is that the Trustee should have held a "live" Auction (which is not required by the Winddown Order).  The Bankruptcy Code contains no such requirement, instead providing that the "business judgment standard" applies to sales under section 363 of the Bankruptcy Code.  *See In re Bouchard Transp. Co., Inc.*, 74 F.4th 743, 755 (5th Cir. 2023) ("Section 363(b) incorporates the business judgment rule, familiar to corporate law.").  In fact, "[w]hether to impose formal sale procedures is ultimately a matter of discretion" that the Fifth Circuit leaves to the bankruptcy court.  *In re Moore*, 608 F.3d 253, 265 (5th Cir. 2010).  Even where such procedures are implemented, courts eschew "rigid adherence to the procedures that govern the sale as to elevate them over the substance of the bankruptcy court's principal responsibility, which is to secure for the benefit of creditors the best possible bid."  *In re Fin. News Network Inc.*, 980 F.2d 165, 169 (2d Cir. 1992) (noting that "in bankruptcy proceedings substance should not give way to form, and that a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" and further that "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code" (quotation omitted)).

36.      Consistent with this fluid approach, courts routinely honor provisions in bidding procedures orders providing trustees considerable discretion to respond to fluid situations, as the Winddown Order did here.  Specifically, although the Debtor suggests that the Trustee violated the Winddown Order by not hosting a live Auction, there was no such requirement.  The phrase "live auction" is nowhere in the Winddown Order.  Instead, the Winddown Order expressly placed the decision to host a live Auction in the Trustee's discretion:

15675328

> The "IP Assets Auction", **if any**, will be held on November 13, 2024, at 10:30 a.m. (prevailing Central Time) through Tranzon360's selected online auction platform, for the sale of the IP Assets, **subject to rescheduling or cancellation by the Trustee in his reasonable discretion**.

Winddown Order ¶ 5 (emphasis added).[7]

37.     Deference to the Trustee's business judgment in conducting the Auction and Sale is woven throughout the Winddown Order. *See, e.g.*, Winddown Order ¶ D ("The Trustee is entitled to authorization to exercise . . . his reasonable business judgment in connection with the Auctions and the Sales of the FSS Assets."). Additionally, the decision to implement additional procedures or requirements on bidders was left to the reasonable business judgment of the Trustee:

> **The Trustee's right is fully reserved, in his reasonable business judgment** and in a manner consistent with his duties and applicable law, **to modify or waive any procedures or requirements with respect to all** Potential Bidders, **Qualified Bidders** or to announce at an Auction modified or additional procedures for such Auction, **and in any manner that will best promote the goals of the bidding process, or impose, before the conclusion of the consideration of bids or an Auction (if held), additional customary terms and conditions on the sale of the IP Assets or the Remaining Assets, as applicable, including without limitation: … (c) modifying the Auction and Sale Procedures or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction …**

*Id.* at ¶ 29 (emphasis added).

38.     The Winddown Order also provides that the Trustee may "modify the foregoing Bid Requirements, to modify any deadlines in paragraph [5] of this Order, to modify any procedures at the IP Assets Auction (if any), and/or to terminate discussions with any Potential Bidders at any time are fully preserved to the extent not materially inconsistent with this Order." *Id.* at ¶ 7.

---

[7] Discretion regarding the Auction is woven throughout the Winddown Order. *See* Winddown Order at ¶¶ 3, 4, 5, 7, 10, 11, 13, and 14.

15675328

39.     On November 11th, in advance of the Auction scheduled for November 13, 2024, at 10:30 a.m. (prevailing Central Time), and in accordance with the Winddown Order, the Trustee, through Tranzon360, implemented procedures to the overbid process for the Auction, setting forth how the Auction would be conducted.  *See* Exhibit G to Sale Motion at 1 (providing IP Assets Auction Bid Instructions).  The process was intended to provide the Trustee the ability to evaluate the bids, as more fully described in the Sale Motion.

40.     In arguing that the Trustee violated an absolute requirement to host a "live" Auction, the Debtor cherry-picks certain phrases to the exclusion of all else.  Specifically, the Emergency Application anchors its analysis on the following phrase: "The Trustee is authorized to implement such other procedures as may be announced by the Trustee and his advisors from time to time on the record at Auction."  Emergency Application ¶ 6 (citing Winddown Order ¶ 12).  This sentence intends only to address changes or additions to procedures implemented *at Auction*.  This sentence is plainly inapplicable given the Trustee exercised his authority to hold the Auction by procedures announced *in advance of the Auction*, and nothing in the sentence precludes the Trustee from implementing such procedures in advance of the Auction pursuant to other sections of the Winddown Order.  *See* Winddown Order ¶ 29.  Even more incredibly, the Debtor ignores the remainder of that sentence:

> The Trustee is authorized to implement such other procedures as may be announced by the Trustee and his advisors from time to time on the record at Auction; *provided* that such other procedures are (i) not inconsistent with this Order, the Bankruptcy Code, or any other order of the Court, (ii) **disclosed orally or in writing to all Qualified Bidders**, and (iii) determined by the Trustee to further the goal of attaining the highest or otherwise best offer for the applicable IP Assets and any other Assets upon which the Qualified Bidder submitted a Qualified Bid.

Winddown Order ¶ 12 (emphasis added).  And, in fact, the Trustee announced all procedures prior to the Auction, in accordance with paragraph 29 of the Winddown Order, and disclosed them in

writing to all bidders—each of whom acknowledged their understanding and voiced no objections. The Debtor's complaint regarding the exact manner of the sale rings hollow.

> **b.**   **The Trustee Was Entitled to Exercise His Business Judgment in Selecting the "Highest or Otherwise Best" Bid**

41.   In the Winddown Order, the Court authorized the Trustee to "determine which Qualified Bid is the highest or otherwise best offer for the respective Assets . . . based on their perceived competitiveness in comparison to other Bids." Winddown Order ¶ 13. The thrust of the Debtor's challenge to the Trustee's selection of Global Tetrahedron's bid is that it contained a smaller cash component ($1,750,000) than the FUAC bid ($3,500,000).[8]

42.   As an initial matter, both this Court and the Bankruptcy Code authorized the Trustee to exercise his broad discretion in determining what was the highest bid. *See* Winddown Order ¶ D ("The Trustee is entitled to authorization to exercise and has exercised his reasonable business judgment in connection with the Auctions and the Sales of the FSS Assets."); *see also In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("The business judgment of a trustee is entitled to great deference."). Trustees are entitled to look beyond the initial lump sum in a given bid and consider all potential value to the estate. *See In re Scimeca Found., Inc.*, 497 B.R. 753, 779 (Bankr. E.D. Pa. 2013) (agreeing that the central inquiry is "whether the 'Trustee carefully weighed the competing bids rather than mechanistically recommending the facially higher bid'" (quotation omitted)).[9] In fact, courts have expressly approved sales with a relatively small cash component but included a release of an unsecured claim that would increase the

---

[8] The specifics of the Trustee's exercise of his reasonable business judgment are more fully set forth in the Sale Motion.

[9] *See also Scimeca Found*, 497 B.R. at 779 ("It is common knowledge of all lawyers and many business men that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two." (quotation omitted)).

15675328

distribution to other unsecured creditors. *See, e.g.*, *In re Sasso*, 572 B.R. 331, 338 (Bankr. D.N.M. 2017). This is, after all, consistent with the "quintessential definition of what is in the best interest of any bankruptcy estate": "payment of all claims." *In re 9 Houston LLC*, 578 B.R. 600, 611 (Bankr. S.D. Tex. 2017) (Bohm, J.) (citing *Sasso*, 572 B.R. at 338). Accordingly, the Trustee was not required to adopt the Debtor's oversimplified approach of accepting the bid with the higher dollar value and could instead examine the bids holistically. And as the Trustee explained in Sale Motion, based on his analysis and in his business judgment, the Global Tetrahedron bid is the high bid, notwithstanding its lower lump-sum cash payment.

43.     More fundamentally, even if the Global Tetrahedron and Connecticut Families' bid was lower than FUAC's, that would still not eliminate all room for the exercise of the Trustee's business judgment. "[C]ourts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount." *In re Tresha-Mob, LLC*, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019). This is because "[w]hile the bid that brings in the most cash often wins, it is 'common knowledge' that the 'highest bid is not always the best bid,' especially if there are 'conditions sufficient to overbalance the difference between the two.'" *Id.* (quotation omitted); *see also In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (stating that "[a] trustee has the duty to maximize the value of the estate" and recognizing that, depending on the circumstances, accepting a lower bid may be consistent with that duty); 3 COLLIER ON BANKRUPTCY ¶ 363.02[4] (same). As explained above, in the Trustee's business judgment, the Global Tetrahedron and the Connecticut Families' bid ultimately offers more value to the estate than the FUAC bid. The Trustee has thus complied with section 363's mandate, which requires only that a sale of the estate's assets "be supported by an articulated business justification,

good business judgment, or sound business reasons." *In re BNP Petroleum Corp.*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (unpublished) (quotation omitted).

44.     The Debtor should not be allowed to hijack the sale process through this Emergency Application by raising issues committed to the Trustee's business judgment.

### 3.     The Entirely Conclusory Allegations in the Emergency Application Do Not Demonstrate a Substantial Likelihood of Success

45.     Desperate to stop a Sale he does not like, Jones summarily concludes that because the form of the sale and bids was different than he expected (notwithstanding the clear language of the Winddown Order providing the Trustee substantial discretion over the shape of the process), there necessarily must have been collusion such that the entire sale should be set aside in favor of his preferred buyer. *See, e.g.*, Emergency Application ¶ 13. Demonstrating a substantial likelihood of success on the merits requires actual evidence, not just conclusory and unsubstantiated assertions, which are insufficient to establish the requirements for a preliminary injunction. *See Gray Cas. & Sur. Co. v. 3i Contracting, LLC*, 2024 WL 1121800, at *11 (N.D. Tex. Mar. 13, 2024). However, that is all the Debtor is able to offer the Court in connection with their request for the extraordinary relief of halting a judicially ordained sale.

### 4.     The Debtor's Claims Fail on Their Merits

#### a.     There Is No Private Cause of Action for Violation of the Courts' Orders

46.     The Debtor suggests that he somehow has a claim for the alleged violation of some unspecified orders during these proceedings, which the Debtor describes without elaboration as "contractual in nature." Emergency Application ¶ 45. This "claim" appears entirely novel, and the Debtor offer no authority for its existence. However, even if some unspecified orders entered by this Court were somehow contractual such that the Debtor has a private cause of action, there has been no violation (or "breach") for the reasons described elsewhere herein.

24

### b.    Declaratory Relief Is Inappropriate Here

47.    Courts in the Fifth Circuit "regularly reject declaratory judgment claims seeking the resolution of issues that are the mirror image of other claims in a lawsuit." *DM Arbor Court, Ltd. v. City of Houston*, 2021 WL 4926015, at *12 (S.D. Tex. Oct. 21, 2021) (quotation omitted); *see also GEL Offshore Pipeline, LLC v. Shell Pipeline Co. LP*, 2021 WL 4976723, at *3 (S.D. Tex. Oct. 8, 2021) ("A request for declaratory judgment should be denied if it 'seek[s] resolution of matters that will already be resolved as part of the claims in the lawsuit.'  Declaratory relief is not allowed when the scope of the requested declaratory judgment is coextensive with another cause of action."  (citation and quotation omitted)).

48.    This is consistent with the "[t]wo principal criteria" that guide the court's exercise of its broad discretion in determining whether to issue a declaratory judgment: whether (1) "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and (2) whether "it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016).  "Simply put, declaratory actions serve no 'useful purpose' when they duplicate other legal claims."  *DM Arbor Court, Ltd.*, 2021 WL 4926015, at *13; *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action.").

49.    The Debtor's declaratory judgment claim fails the above tests.  The validity of the sale will soon be resolved ***in connection with the Court's consideration of the Sale Motion***.  The requested declarations would therefore not serve any useful purpose and are merely mirror images of what the Court will consider in connection with the Sale Motion.

**B.      There Has Been No Demonstration of any Immediate and Irreparable Harm that Would Result from the Sale**

50.      The second requirement for injunctive relief requires harm to the movant, not a third party. *See, e.g.*, *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("[T]he issuance of a preliminary injunction requires a showing of irreparable harm ***to the movant*** rather than to one or more third parties." (emphasis added)); *see also Coleman v. Meridian Imaging, P.A.*, 2024 WL 3682300, at *2 (S.D. Miss. Aug. 6, 2024) (collecting cases). Yet, as explained above, the Debtor lacks any pecuniary interest in these proceedings because— even if FUAC's $3.5 million offer were accepted—there is no hope of a surplus after satisfaction of the roughly $1.5 billion in claims.  It is perhaps for this reason that the Emergency Application attempts to eliminate this element entirely.

51.      However, the lone case the Debtor offers for this proposition, *Fisher v. Apostolou*, does not alter the conclusion of the numerous courts (including those cited above) to the contrary. Instead, as *Collier's* explains, that line of cases simply stands for the proposition that the harm from some acts (like stay violations or other conduct that would defeat a bankruptcy court's jurisdiction) is so obvious that no evidentiary showing is necessary.  *See* 2 COLLIER ON BANKRUPTCY ¶ 105.03[1][b].  But that does not mean the requirement does not itself exist.  After all, section 105's powers are not unlimited and do not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity."  *In re Sadkin*, 36 F.3d 473, 478 (5th Cir. 1994) (quotation omitted). Instead, section 105's powers must be exercised within the confines of the Bankruptcy Rules, including Bankruptcy Rule 7065's incorporation of the traditional injunction requirements.  *See Stutsman Constr., LLC v. Adair*, 2023 WL 6368123, at *6 (M.D. La. Sept. 28, 2023) (holding bankruptcy court cannot use section 105 to "override explicit mandates of other sections of the

Bankruptcy Code" or the Bankruptcy Rules (quotation omitted)). And in any event, none of the conduct cited by the Debtor would defeat this Court's jurisdiction, unlike in *Fisher*.

52.     The Debtor's final attempt at establishing harm is equally confounding. On the one hand, the Emergency Application suggests that Jones would be harmed if his Persona and IP Rights were sold to a third party because it could create "massive market confusion if his personal rights are marketed by anyone other than himself." *See, e.g.*, Emergency Application ¶¶ 43, 73. On the other hand, "the Jones Plaintiff only wish the bid of Tetrahedron and the Connecticut Plaintiffs declared void, and that FUAC's bid be accepted." Emergency Application ¶ 60. Setting aside the ***critical*** fact that the Trustee ***is not seeking to sell the Jones Persona or Jones IP***, the Emergency Application contains no evidence that the feared market confusion (which at most involves a monetary loss) would be avoided by selling to FUAC rather than to Global Tetrahedron, as the Debtor contends.[10] *See, e.g.*, *Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464 (5th Cir. 1985) (explaining that "[t]he key word . . . is irreparable," and an "injury is 'irreparable' only if it cannot be undone through monetary remedies" (quotation omitted)).

**C.     The Balance of Harms Weighs Against the Requested Relief**

53.     As explained above, any harm to Jones from allowing the sale to proceed is, at best, speculative. To the contrary, given the incredibly broad and ambiguous nature of the injunctive relief sought, granting the Emergency Application would be devasting to the estate and Jones's creditors. The injunctions requested would bind the Trustee's hands and bring the administration

---

[10] Indeed, the Emergency Application suffers from a further logical inconsistency. Jones describes Global Tetrahedron as "the owner and operator of what [he] would call a series of satirical publications. They take shots at conservative people and causes like [him]." Jones Declaration ¶ 5; *see also* Emergency Application ¶ 43. The Debtor also asserts that Global Tetrahedron is already announcing themselves as owners of InfoWars. Emergency Application ¶ 41. If these allegations are true, then it seems consumers would be perfectly clear on what is happening. Indeed, in the time since the sale to Global Tetrahedron, sales of InfoWars' perishable goods has fallen, reflecting that consumers (largely in response to Jones's comments) understand the change in ownership.

15675328

of this estate to a screeching halt.  There is simply no reasoned basis for victimizing Jones's creditors in this manner.  Additionally, Global Tetrahedron has wired the Purchase Price (as defined in the Sale Motion) to the Trustee, which is being held in escrow pending resolution of these matters.

54.     The Fifth Circuit has rejected injunctive relief where the "harm to defendants is at least as great as the harm to plaintiffs."  *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 390 (5th Cir. 1984).  At an absolute minimum, that is the case here, so injunctive relief should be withheld.

**D.     The Public Interest Is Best Served by Denying the Emergency Application**

55.     "In bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate."  *In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016).  The Trustee, as a valid exercise of his business judgment, has determined that the Sale is in the best interests of the estate.  The public policy animating the Bankruptcy Code (and the Winddown Order) requires honoring the Trustee's judgment.  *See, e.g.*, *In re Frantz*, 534 B.R. 378, 390 (Bankr. D. Idaho 2015) (finding that the stay of a sale order does not serve "the legitimate public interest in seeing the bankruptcy process not just run its course but to do so with due speed" and in a manner with the duties and authority bestowed upon trustees by Congress).  Moreover, Jones had every opportunity to object to the Winddown Order, and his failure to do so precludes them from now claiming a deprivation of due process.  *See id.* (observing the public interest in due process and noting the debtors suffered no deprivation thereof simply because they were not given a second opportunity to object).

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order (1) denying all injunctive relief requested in the Emergency Application, and (2) granting the Trustee all other and further relief to which he is justly entitled.

Dated: November 24, 2024
       Houston, Texas

Respectfully submitted,

By: */s/ Joshua W. Wolfshohl*
    Joshua W. Wolfshohl (Bar No. 24038592)
    Michael B. Dearman (Bar No. 24116270)
    Jordan T. Stevens (Bar No. 24106467)
    Kenesha L. Starling (Bar No.24114906)
    **PORTER HEDGES LLP**
    1000 Main Street, 36th Floor
    Houston, Texas 77002
    Telephone: (713) 226-6000
    Facsimile: (713) 226-6248
    jwolfshohl@porterhedges.com
    mdearman@porterhedges.com
    jstevens@porterhedges.com
    kstarling@porterhedges.com

    *and*

    Erin E. Jones (TX 24032478)
    **JONES MURRAY LLP**
    602 Sawyer Street, Suite 400
    Houston, Texas 77007
    Telephone: (832) 529-1999
    Fax: (832) 529-3393
    erin@jonesmurray.com

    *Counsel for Christopher R. Murray, Chapter 7 Trustee*

15675328

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that a copy of the foregoing document was served on November 24, 2024, on all parties receiving ECF service in the above-captioned case.

<u>*/s/ Joshua W. Wolfshohl*</u>
Joshua W. Wolfshohl

15675328